IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| PDG PRESTIGE, INC., | § | Case No. 21-30107 |
| | § | |
| Debtor. | § | |
| | § | |

## MOTION OF DEBTOR TO (I) ENTER INTO DEBTOR POSSESSION CREDIT AGREEMENT, (II) GRANT PRIMING LIENS UNDER CODE SEC. 364(D), AND (III) PROVIDE RELATED RELIEF

**TO THE HONORABLE H. CHRISTOPHER MOTT, U.S. BANKRUPTCY JUDGE:**

PDG-Prestige, Inc., debtor and debtor in possession (the "Debtor" or "PDG") files this *Motion to (I) Enter into Debtor Possession Credit Agreement, (II) Grant Priming Liens Under Code Sec. 364(d), and (III) Provide Related Relief* (the "DIP Motion") seeking to and in support thereof would show the Court the following.

### INTRODUCTION

1.     PDG-P seeks entry of a final order approval of debtor in possession financing that essentially is a re-financing transaction that will resolve the first lien indebtedness which precipitated the bankruptcy case and the claims of a second lien holder.

2.     Considering the limited number of claims involved in this case, PDG-P seeks entry of a final order on an expedited basis.  As explained below, the DIP lender essentially will be the only creditor of the estate following the DIP financing transaction.

3.     The credit agreement, proposed order, and local rules checklist are attached as exhibits.

*4.    PDG-P contemporaneously has filed a motion to set this DIP Motion for hearing on April 12, 2021 or April 13, 2021.*

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this Motion pursuant to Sections 105, 363, and 1101 et seq. of the United States Bankruptcy Code, Title 11 of the U.S. Code, 11 U.S.C. §101 et seq. (the "Code" or "Bankruptcy Code"), and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" or individually a "Bankruptcy Rule"), and 28 U.S.C. §§157 and 1334.

6.    This matter constitutes a core proceeding under 28 U.S.C. §157(b).

7.    Venue is proper under 28 U.S.C. §§1408 and 1409.

8.    The Court has constitutional authority to decide this Motion under *Stern v. Marshall*, 564 U.S. 462 (2011) and its progeny.

## FACTUAL BACKGROUND

**The identify and background of the Debtors and Debtors in Possession.**

9.    PDG-P is a real estate development enterprise which owns a ± 3.29acre tract of real property in Las Cruces, Dona Ana County, New Mexico and sometimes referred to as Mesilla Valley Mall Subdivision, Replat No. 5 (the "Property").

10.    PDG-P also owns the majority of the equity interest in a second real estate development entity, The Gateway Ventures, LLC, which is the subject of a separate bankruptcy case currently pending in this Court.

**The Commencement of the Bankruptcy Cases.**

11.    On February 15, 2021, PDG-P filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §101 et seq. (the "Code" or the "Bankruptcy Code").

12.     The purpose of the commencement of this case was the prevention of a nonjudicial foreclosure scheduled for February 16, 2021 by City Bank of Lubbock, Texas.

13.     The Debtor is operating as debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

14.     No trustee, examiner, or statutory creditors' committee has been appointed in this Chapter 11 case.

**Factual background in support of the relief requested.**

15.     PDG Inc. acquired the Property on or about July 13, 2018 for the purposes of re-development, with financing provided by West Texas State Bank.

16.     PDG, Inc. granted West Texas State Bank a first lien deed of trust in, to, and against the Property in connection with the acquisition financing.

17.     On or about August 8, 2018, PDG, Inc. conveyed the Property to PDG-P.

18.     City Bank acquired West Texas State Bank in 2019.

19.     As of the Petition Date, City Bank asserts that its secured claim was in the amount of $2,705,661.10.  City Bank also has asserted that its lien position is under-secured.

20.     New Mexico Real Estate Advisors, Inc. ("NMREA") has filed a series of statutory liens against the Property with respect to broker's commissions sought for various ground leases entered into prepetition between PDG-P and various tenant parties.  The aggregate claim asserted in the liens is in the amount of $377,725.36; however, PDG-P disputes this claim and believes that a substantially reduced total and no more than half of said amount, and possibly less, had been earned by NMREA as of the Petition Date.

21.     Since acquisition of the Property, PDG-P has scraped the property of previously existing improvements and prepared the Property for redevelopment.  As of the Petition Date, PDG-P has conducted some site improvements of the Property.

22.     Also prior to the Petition Date, PDG-P entered into five (5) ground leases (the "Ground Leases") with tenants for structures to be constructed on the Property.

23.     PDG-P requires financing in order to complete the development of the Property and to fulfill the obligations provided in the Ground Leases.

24.     PDG-P is unable to obtain financing on an unsecured basis, on the basis of providing only an administrative expense claim in this case, or upon granting liens in the Property that are junior or equal to the liens of City Bank and/or NMREA.

25.     Accordingly, PDG-P has identified a specialty debtor-in-possession lender, certain investment fund(s) for which Legalist DIP GP, LLC serves as general partner ("Legalist"), to provide a debtor-in-possession loan (the "DIP Loan") under Code § 364(d).

26.     A proposed form of credit agreement is attached hereto as **Exhibit PDG001**.

27.     The Exhibit J Checklist from the Bankruptcy Local Rules for the DIP Loan is attached hereto as **Exhibit PDG002**.

28.     A proposed form of order to approve this DIP Motion an the DIP Loan (the "DIP Loan") is attached hereto as **Exhibit PDG003**.

29.     The key terms of the DIP Loan are set forth in the table below.

| Term | Details |
|---|---|
| Original Principal Amount / DIP Commitment | $4,700,000.00 |
| Maturity Date: | 270 days after the Effective Date |
| Interest Rate: | Prime + 5.00% per annum |
| Commitment Fee: | 2.75% of the DIP Commitment |

| Term | Details |
|---|---|
| Underwriting Fee | 1.75% of the DIP Commitment |
| Monitoring Fee: | 1.75% of the DIP Commitment |
| Makewhole Fee | 4.75% of the DIP Commitment (see §2.07 for conditions) |
| Collateral: | Super-priority lien on the property located at 510 and 550 S. Telshor Blvd Las Cruces, NM 88011 |

30. With the proceeds of and first draw from DIP Loan, PDG-P intends to extinguish the first lien debt of City Bank in the amount of approximately $2,705,661.10 and pay to NMRFA approximately the amount of $168,862.00 for the release of its liens for commissions earned through the Petition Date.

31. City Bank has indicated that it intends to prosecute a motion for relief from the automatic stay and/or engage in other litigation within this case in order to oppose the efforts of PDG-P at reorganization.

32. PDG-P believes that the DIP Loan is in the best interests of the estate and is a proper exercise of the business judgment of PDG-P.

**RELIEF REQUESTED**

33. PDG-P respectfully requests that the Court approve the DIP Loan as set forth above and enter the proposed form of DIP Order, Exhibit PDG003.

**BASIS OF RELIEF**

34. PDG-P believes the DIP Loan as provided in the DIP Credit Agreement and DIP Order provide the best opportunity to obtain the financing necessary to proceed with the development of the Property.

35. The payment of the secured claims of City Bank and NMREA effectively (and the release of the liens asserted against the Property) constitutes a refinance of such indebtedness and resolves, with respect to City Bank, the claim which precipitated the bankruptcy case.

36.    City Bank has threatened to date to prosecute a motion for relief from the automatic stay and/or to otherwise oppose the efforts of PDG-P at reorganization. Although PDG-P believes that any such litigation within this case brought by City Bank could be and would be defeated, PDG-P instead would prefer to focus on completing the development plan for the Property and fulfilling the contingencies necessary to fulfill the Ground Leases. The financing provided by the DIP Loan removes the distraction of the City Bank claim and resolves the claim sooner rather than later.

37.    With the payment of claims to City Bank and NMREA, PDG-P will resolve the two primary interests that would require resolution upon any sale of some or all of the Property under Code §363(f) and/or through an exit pursuant to a Chapter 11 plan.

38.    PDG-P also will be in a position to complete the development contemplated by the Ground Leases, and thus fulfill the requirements of the Ground Leases and preserve the ultimate value of the Property.

39.    Accordingly, PDG-P believes that the DIP Loan is a proper exercise of its business judgment and is in the best interest of the estate and any other creditors.

**RESERVATION OF RIGHTS**

40.    PDG-P reserves the right to amend and/or supplement this DIP Motion and any exhibits thereto through and until the time of any hearing.

**NOTICE**

41.    Notice of the DIP Motion and the accompanying motion for expedited approval is being served upon all creditors and parties and interests, including by expedited means by direct email from the undersigned to any email address known for any creditor or party in interest and/or its counsel.

## CONCLUSION AND PRAYER

WHEREFORE, PDG-Prestige, Inc., debtor and debtor in possession, respectfully requests that the Court set this matter for an expedited hearing and that the Court approved the DIP Loan by and through the form of DIP Order attached hereto.  Movant respectfully requests such other and further relief to which Movant is entitled at law or in equity.


Dated:  March 26, 2021        Respectfully submitted:

WEYCER, KAPLAN, PULASKI & ZUBER, P.C.

By:___*/s/ Jeff Carruth*_____
    JEFF CARRUTH (TX SBN:. 24001846)
    3030 Matlock Rd., Suite 201
    Arlington, Texas 76105
    Telephone: (713) 341-1158
    Fax: (866) 666-5322
    E-mail:  jcarruth@wkpz.com

PROPOSED ATTORNEYS FOR
PDG PRESTIGE, INC.,
DEBTOR AND DEBTOR IN POSSESSION

### CERTIFICATE OF CONFERENCE

The undersigned certifies that he communicated with counsel for City Bank and New Mexico Real Estate Advisors, Inc. prior to the filing of the Motion for Expedited Hearing.  Both parties consent to expedited consideration on April 12, 2021 or April 13, 2021.

*/s/ Jeff Carruth*
JEFF CARRUTH

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served on March 26, 2021 (1) by electronic notice to all ECF users who have appeared in this case to date (2) by regular mail to all parties appearing in the attached address list (i.e. mailing matrix) obtained from the Court's PACER facility.  A separate certificate of service with copies of this lists will be filed.

*/s/ Jeff Carruth*
JEFF CARRUTH

**EXHIBIT PDG001**

LEGALIST 03/24/21 +PDG-P 20210326.0926

# DEBTOR-IN-POSSESSION
# TERM LOAN CREDIT AGREEMENT

**among**

**PDG PRESTIGE, INC.,**
**as Debtor,**

**and**

**Certain Investment Funds for Which**
**LEGALIST DIP GP, LLC**
**Serves as General Partner,**
**as DIP Lender**

This DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT (the "**Agreement**"), dated as of _____, is entered into among PDG Prestige, Inc. (the "**Debtor**") and certain investment fund(s) for which Legalist DIP GP, LLC serves as general partner, as lender, agent, and collateral agent (in such capacities, the "**DIP Lender**").

## RECITALS

WHEREAS, on February 15, 2021(the "**Petition Date**"), the Debtor filed a voluntary petition in the United States Bankruptcy Court for the Western District of Texas (the "**Bankruptcy Court**") for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**" or "**Code**") and its Chapter 11 case is being administered under the caption *In re PDG Prestige, Inc.*, No. 21-30107 (the "**Case**");

WHEREAS, the Debtor has continued in possession of its assets and management of its business pursuant to Bankruptcy Code sections 1107 and 1108;

WHEREAS, an immediate and ongoing need exists for the Debtor to obtain funds in order to fund the Case and work toward a successful exit from Chapter 11 and, accordingly, the Debtor requested that the DIP Lender extend the DIP Loans;

WHEREAS, the DIP Lender is willing to extend DIP Loans (each a "**DIP Draw**") on the terms hereof in an aggregate maximum amount of $4,700,000 (the "**DIP Commitment**");

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto (the "**Parties**") agree as follows:

## ARTICLE I
## DEFINED TERMS

**Section 1.01 <u>Definitions</u>.** As used in this Agreement:

"**Affiliate**" has the meaning given to it in the Bankruptcy Code.

"**Agreement**" has the meaning given to it in the preamble hereto.

"**Approved Form**" means in form and substance acceptable to (as evidenced by the prior written consent of) the DIP Lender.

"**Avoidance Actions**" means all claims and causes of action described in Bankruptcy Code Chapter 5, or any non-bankruptcy law referenced therein, and all proceeds thereof.

**EXHIBIT PDG001**

"**Bankruptcy Code**" has the meaning given to it in the Recitals.

"**Bankruptcy Court**" has the meaning given to it in the Recitals.

"**Borrowing Request**" means an executed borrowing request substantially in the form attached hereto as Exhibit A and otherwise in Approved Form.

"**Budget**" means a rolling 13-week budget containing detailed line items of the Debtor's projected receipts and disbursements, in Approved Form, including as the same may be revised by the Debtor from time to time in Approved Form. The Budget as of the date hereof is attached hereto as Exhibit B.

"**Business Day**" means every day that is not a Saturday, Sunday, or Legal Holiday (as defined in Federal Rule of Bankruptcy Procedure 9006(a)(6)).

"**Case**" has the meaning given to it in the Recitals.

"**Cash-Management Requirements**" has the meaning given to it in Section 5.07.

"**Commitment Fee**" has the meaning given to it in Section 2.05(i).

"**Debt**" has the meaning given to it in the Bankruptcy Code.

"**Debtor**" has the meaning given to it in the preamble hereto.

"**DIP Blocked Account**" has the meaning given to it in Section 5.07.

"**DIP Claims**" means "superpriority" administrative-expense claims with priority over (x) all other administrative-expense claims, expenses, and costs permitted by, described in, or entitled to priority under the Bankruptcy Code (subject to the Carveout (as defined in the DIP Order)) and (y) all other unsecured claims against the Debtor.

"**DIP Collateral**" means all assets and properties, whether real, personal, intellectual, or otherwise, whether tangible or intangible, whether domestic, foreign, or international, that the Debtor now owns or hereafter acquires, or to or in which the Debtor, now or in the future, holds any right, title, or interest (whether fixed, contingent, inchoate, or otherwise), expressly including all Avoidance Actions, together with (in each case) all proceeds thereof; provided that the DIP Collateral shall not include Excluded Collateral.

"**DIP Commitment**" has the meaning given to it in the Recitals.

"**DIP Draw**" has the meaning given to it in the Recitals.

"**DIP Lender**" has the meaning given to it in the preamble hereto.

"**DIP Lender Expenses**" has the meaning given to it in Section 11.03.

"**DIP Liens**" has the meaning given to it in Section 10.02.

"**DIP Loan Documents**" means this Agreement, all Borrowing Requests, the DIP Credit Agreement, the DIP Order, the Budget and related reporting, all documents relating to the Cash-Management Requirements, and all other agreements, documents, and instruments in any way arising from, related to, or connected with the DIP Commitment, DIP Loans, DIP Claims, and/or DIP Liens, together with all schedules, exhibits, and other addenda thereto, all of which shall be in Approved Form.

"**DIP Loans**" has the meaning given to it in Section 2.01(a).

**EXHIBIT PDG001**

"**DIP Obligations**" means DIP Lender Expenses, together with all principal of, and interest and fees on (including, without limitation, any applicable Undrawn Line Fee, the Monitoring Fee, Commitment Fee, Underwriting Fee, and any applicable Makewhole Fee) the DIP Loans, any amount owed to any Indemnified Person, and any other amount owed by the Debtor under any DIP Loan Document.

"**DIP Order**" means an order of the Bankruptcy Court approving the DIP Loans in Approved Form.

"**Effective Date**" has the meaning given to it in Section 3.02.

"**Event of Default**" has the meaning given to it in Section 8.01.

"**Excluded Collateral**" means the assets and properties set forth on Schedule 4.

"**Existing Liens**" means the Liens set forth on Schedule 2.

"**Indemnified Liabilities**" has the meaning set forth in Section 7.01.

"**Indemnified Persons**" has the meaning set forth in Section 7.01.

"**Lien**" has the meaning given to it in the Bankruptcy Code.

"**Makewhole Fee**" has the meaning given to it in Section 2.07(c).

"**Maturity Date**" means the earliest to occur of (x) 270 days after the Effective Date of the first DIP Draw, (y) repayment in full of all outstanding DIP Loans, and (z) the acceleration of the DIP Loans following an Event of Default.

"**Milestones**" means, collectively, the events and corresponding deadlines set forth on Schedule 1.

"**Monitoring Fee**" has the meaning given to it in Section 2.05(iii).

"**Permitted Senior Liens**" means the Liens set forth on Schedule 3.

"**Permitted Variances**" has the meaning given to it in

"**Person**" has the meaning given to it in the Bankruptcy Code.

"**Petition Date**" has the meaning given to it in the Recitals.

"**Underwriting Fee**" has the meaning given to it in Section 2.05(ii).

"**Uniform Commercial Code**" has the meaning given to it in Section 11.08. [1]

**ARTICLE II**
**DIP LOANS**

**Section 2.01 In General.**

(a) Subject to the terms hereof, the DIP Lender agrees, upon the Effective Date, to make available to the Debtor, in one or more DIP Draws, term loans in the full amount DIP Commitment (such term loans, the "**DIP Loans**").

---

[1]     Capitalized terms used but not defined herein have the meanings given to them in the DIP Order.

**EXHIBIT PDG001**

(b) Subject to Section 2.7, all amounts owed hereunder with respect to the DIP Loans shall be paid in full no later than the Maturity Date. Any principal amount of the DIP Loans repaid or prepaid may not be reborrowed.

**Section 2.02** **Use of Proceeds.** The proceeds of the DIP Loans shall be used by the Debtor solely to:

(i) Pay DIP Lender Expenses;

(ii) Pay all other DIP Obligations; and

(iii) Pay other amounts permitted under the Budget (including the Carveout (as defined in the DIP Order)).

(iv) In no event shall any portion of the DIP Loans be used for payment of fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender.

**Section 2.03** **[Omitted.]**

**Section 2.04** **Interest; Undrawn Line Fee.**

(a) Interest Rate. The outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue interest from the Effective Date at the U.S. prime rate plus 5.00% per year, which shall accrue and be compounded and capitalized monthly.

(b) Default Interest. While an Event of Default has occurred and is continuing, the outstanding principal amount of the DIP Loans (together with all other due and payable DIP Obligations) shall accrue an additional 4.75% in interest per year, which shall accrue and be compounded and capitalized monthly. Payment or acceptance of the increased rates of interest provided for in this Section 2.4(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the DIP Lender.

(c) Undrawn Line Fee. Any undrawn portion of the DIP Commitment shall accrue a fee (the "**Undrawn Line Fee**") from date hereof at 4.75% per year, which shall accrue and be compounded and capitalized monthly.

(d) Payment Terms. All interest (including default interest), together with the fees described in Section 2.05, shall be compounded and capitalized in arrears on the first Business Day of month and due and payable upon the Maturity Date.

**Section 2.05** **Fees.** The following fees shall be deemed fully and irrevocably earned upon the date hereof and shall be DIP Obligations for all purposes:

(i) A onetime "**Commitment Fee**" of 2.75% of the DIP Commitment, due and payable in cash upon the Maturity Date;

(ii) A onetime "**Underwriting Fee**" of 1.75% of the DIP Commitment, due and payable in cash upon the Maturity Date; and

**EXHIBIT PDG001**

(iii)A "**Monitoring Fee**" of 1.75% of the DIP Commitment per year, payable in kind monthly as provided in Section 2.04(d).

**Section 2.06 Repayment.** Subject to Sections 2.07, the DIP Loans shall be due and payable, and the Debtor unconditionally agrees and promises to repay to the DIP Lender all other outstanding DIP Obligations, in cash on the Maturity Date.

**Section 2.07 Prepayments.**

(a) Voluntary Prepayments. The DIP Loans may be voluntarily repaid prior to the Maturity Date beginning 90 days after the Effective Date, in the minimum amount of $50,000, subject to the contemporaneous payment of the applicable Makewhole Fee. For the avoidance of doubt, the Makewhole Fee shall not apply to any payments made on or after the 181st day after the Effective Date.

(b) Mandatory Repayments. The DIP Loans shall be mandatorily repaid to the extent of, and within 10 Business Days of the Debtor's receipt of, any net proceeds from the sale or other disposition of any DIP Collateral; provided that (i) no such sale or disposition shall occur without the DIP Lender's prior written consent, which consent shall not be unreasonably withheld, and any such sale or disposition shall be conducted solely in Approved Form, and (ii) any such sale and paydown shall not prevent the Debtor from obtaining draws under this DIP Loan and/or expending funds in accordance with the Budget; provided further that such any repayment required to be made prior to 90 days after the Effective Date shall be subject to the contemporaneous payment of the applicable Makewhole Fee.

(c) As used in this Section 2.07, "**Makewhole Fee**" means an additional fee of 4.75% of the amount of voluntarily or required to be repaid, which fee shall be a DIP Obligation for all purposes.

**Section 2.08 General Provisions Regarding Payments.**

(a) Payments. All payments by or on behalf of the Debtor of principal, interest, fees, or other DIP Obligations shall be made in U.S. dollars in same-day funds, without defense, setoff, or counterclaim of any kind, free of any restriction or condition, and delivered to DIP Lender so as to be actually received by it no later than 1:00 PM New York time. All funds actually received by the DIP Lender after that time shall be deemed to have been paid on the next Business Day.

(b) Non-Conforming Payments. Any payment not conforming to the foregoing Clause (a) shall be deemed a non-conforming payment and shall not be deemed to have been actually received by the DIP Lender until the later of (x) the time such funds become available funds and (y) the next Business Day. Interest and fees shall continue to accrue on any principal (together with all other due and payable DIP Obligations) until such funds become available funds.

(c) Payments to Include Accrued Interest. All payments in respect of the principal amount of the DIP Loans shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments shall be applied in accordance with Section 8.03.

(d) Business Days. Whenever a payment hereunder is due on a day that is not a Business Day, such payment shall be made on the next Business Day.

**Section 2.09 Termination of Commitments.** The DIP Commitment of the DIP Lender shall be automatically and permanently reduced (x) by the principal amount of each DIP Loan made by the DIP Lender pursuant to Section 2.01(b) and (y) in full, upon (i) acceleration of the DIP Loans

**EXHIBIT PDG001**

under Section 8.02(a)(i) or (ii) the election of the DIP Lender while an Event of Default has occurred and is continuing.

### ARTICLE III
### CONDITIONS PRECEDENT

**Section 3.01 <u>Conditions Precedent to DIP Draws</u>.** The obligation of the DIP Lender to make DIP Draws available to the Debtor in the aggregate amount of the DIP Commitment (provided no Event of Default shall (x) have occurred and be continuing or (y) be reasonably likely to result therefrom), is subject to the occurrence (with respect to each such DIP Draw) of all of:

(i) The Bankruptcy Court's entry of the DIP Order, which remains in full force and effect as so entered and in Approved Form;

(ii) The Debtor's satisfaction of all applicable Milestones;

(iii) The Debtor's satisfaction of all applicable Cash-Management Requirements;

(iv) The Debtor's delivery of an executed Borrowing Request in the amount of such DIP Draw; and

(v) Each of the representations and warranties set forth in this Agreement and in each other DIP Loan Document shall be true and correct as of the Effective Date, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and warranty shall have been true and correct as of such earlier date.

**Section 3.02 <u>Effective Date</u>.** With respect to any DIP Draw, the date on which all of the conditions precedent described in Section 3.01 have been met shall be the "**Effective Date**."

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF DEBTOR

To induce the DIP Lender to provide the DIP Loans, the Debtor makes to the DIP Lender all of following representations and warranties, which representations and warranties shall (x) be deemed to have been made and remade as of each Effective Date and (y) survive the execution and delivery of this Agreement:

**Section 4.01** Corporate Status; Corporate Authorization.

(a) The Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and is duly qualified and in good standing in every other jurisdiction where it is doing business, and the execution, delivery, and performance by the Debtor of this Agreement (x) are within its authority, (y) have been duly authorized, and (z) do not conflict with or contravene its corporate-governance or organizational documents.

(b) The execution, delivery, and performance of obligations under this Agreement by the Debtor (x) do not require any consent that has not been obtained and (y) are not and will not be in conflict with or prohibited or prevented by any (i) law, rule, or regulation, (ii) corporate-governance or organizational document of the Debtor or (iii) other instrument or agreement, in each case binding on the Debtor or affecting its property.

**Section 4.02 <u>Execution and Binding Effect</u>.** Upon execution and delivery hereof, this Agreement shall constitute the legal, valid, and binding obligation of the Debtor, enforceable in accordance with its terms.

**EXHIBIT PDG001**

**Section 4.03 <u>DIP Collateral</u>.** The Debtor has good and marketable title to all DIP Collateral, free of all Liens, security interests, pledges, and other encumbrances, other than the DIP Liens and Existing Liens, with the limited exception of the one or more Liens and/or notices of lis pendens which will be addressed by the DIP Order or other order of the Bankruptcy Court, or otherwise through the Budget and/or DIP Loan.

**Section 4.04 <u>Absence of Material Adverse Effect</u>.** There has been no act, condition, or event that has had, or may reasonably be expected to have, a material adverse effect on the Debtor or its operations since the Petition Date.

**Section 4.05 <u>Governmental Approvals and Filings</u>.** Except as has already been obtained, no approval, authorization, or other action by, or filing, recording, or registration with, or notice to, any governmental body is or will be necessary in connection with the execution, delivery, or performance of this Agreement.

**Section 4.06 <u>Misstatements and Omissions</u>.** Since the Petition Date, no information furnished or made available by the Debtor (directly or indirectly) to the DIP Lender (including all information contained in the Case's docket) (x) contains any material misstatement of fact or (y) omits any material fact necessary to make such information not misleading.

**ARTICLE V**
**AFFIRMATIVE COVENANTS**

So long as any DIP Obligation remains outstanding, the Debtor shall perform all of the following covenants:

**Section 5.01 <u>Budget Reporting and Compliance</u>.**

(a) No later than the Tuesday of each other week, the Debtor shall provide the DIP Lender (each in Approved Form):

    (i) A variance report (certified by an appropriate officer of the Debtor) comparing, on a line-item basis, actual cash receipts and disbursements to those contained in the Budget, for both the preceding week and cumulatively from the date hereof, together with detailed explanations of all variances (if any); and

    (ii) An updated 13-week Budget beginning on the date of delivery thereof.

(b) In no event shall actual cash receipts vary downward, or cash disbursements vary upward, from the Budget (on a line-item, weekly, or cumulative basis) by more than 7.5% (the "**Permitted Variances**").

**Section 5.02 <u>Accounting; Financial Statements</u>.** The Debtor shall keep true and accurate books of record and account in accordance with past practice and the requirements of the Bankruptcy Court and sufficient to permit the preparation of financial statements in accordance with generally accepted accounting principles.

**Section 5.03 <u>Maintenance of Existence</u>.** The Debtor shall do all things necessary to maintain (x) its corporate or other existence in accordance with its organizational documents (which shall not be amended without the prior written consent of the DIP Lender) and (y) all rights, licenses, and franchises.

**Section 5.04 <u>Preservation of Assets.</u>** The Debtor shall maintain its assets (including all DIP Collateral) in good operating conditions and shall make such repairs and replacements as are

**EXHIBIT PDG001**

required, in accordance with the Budget; provided that, in no event shall the DIP Lender be surcharged with respect to such maintenance of the DIP Collateral.

**Section 5.05 <u>Notice of Material Events.</u>** The Debtor shall notify the DIP Lender promptly in writing of:

(i)  The occurrence of any default or Event of Default;

(ii) Any threatened or pending litigation or other proceeding or claim affecting the Debtor other than the Case and litigation and/or proceedings disclosed in the Case as of the Effective Date; and

(iii)Any other development that results in, or could reasonably be expected to result in, a material adverse effect on the Debtor or its operations.

**Section 5.06 <u>Use of Proceeds.</u>** The Debtor shall use the proceeds of the DIP Loans only as permitted by Section 2.02.

**Section 5.07 <u>Cash-Management Requirements</u>**. The Debtor shall establish and maintain a cash-management system in Approved Form, which system shall (at a minimum (i) include, for each such account (other than payroll accounts, a "**DIP Blocked Account**"), a deposit account control agreement in favor of the DIP Lender sufficient to grant the DIP Lender "control" thereof under the Uniform Commercial Code and otherwise in Approved Form, and (ii) prohibit the Debtor's use of any deposit account (other than with respect to near-term payroll obligations) that is not a DIP Blocked Account (collectively, the "**Cash-Management Requirements**").

**Section 5.08 <u>Taxes.</u>** The Debtor will pay its tax liabilities accruing after the Petition Date before the same shall become delinquent or in default, except where the validity or amount thereof is being contested in good faith by appropriate proceedings and the Debtor has set aside on its books adequate reserves in accordance with generally accepted accounting principles.

**Section 5.09 <u>Milestones.</u>** The Debtor shall comply with all applicable Milestones.

**Section 5.10 <u>Compliance with Laws</u>**. The Debtor shall comply all applicable laws, rules, and regulations.

**Section 5.11 <u>Bankruptcy Court Filings.</u>** The Debtor shall commence all actions in, file all motions, applications, and proposed orders with relating to the DIP Loan, and make all other submissions to the Bankruptcy Court relating to the DIP Loan only in Approved Form.

**Section 5.12 <u>Full Access to Information.</u>** The Debtor shall promptly provide the DIP Lender with all requested information and full and complete access to all executives, directors, and advisors of the Debtor, together with access to inspect any DIP Collateral, when requested by the DIP Lender; provided that, without any prior request from the DIP Lender, the Debtor shall deliver to the DIP Lender in real time copies of all offers (whether formal or informal, firm or contingent) to acquire the Debtor, the DIP Collateral, or any part thereof, together with all related correspondence, and all other materials regarding the Debtor's progress on the Milestones.

**Section 5.13 <u>Stay, Extension, and Usury Laws.</u>** The Debtor (x) covenants that it will not at any time in any manner whatsoever claim or take the benefit or advantage of any stay, extension, or usury law (wherever enacted) that may affect the performance in full of this Agreement and (y) expressly waives the benefit of all such laws.

**Section 5.14 <u>Timely Payment of DIP Lender Expenses, Other DIP Obligations</u>.** The Debtor shall, in addition to repaying all other DIP Obligations when due and payable hereunder, timely pay all DIP Lender Expenses.

**Section 5.15 <u>Further Assurances.</u>** The Debtor shall fully cooperate with the DIP Lender, and take such actions and execute such documents and instruments as the DIP Lender may request, in furtherance of this Agreement and the transactions contemplated hereby, including but not limited to any deed of trust or other mortgage security instrument, expressly including all steps necessary or desirable to maintain the priority, validity, and enforceability of the DIP Claims and DIP Liens on the DIP Collateral.

**ARTICLE VI**
**NEGATIVE COVENANTS**

So long as any DIP Obligation remains outstanding, the Debtor shall perform all of the following covenants:

**Section 6.01 <u>Indebtedness</u>.** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any Debt, other than (x) Debt existing as of the Petition Date, (y) the DIP Obligations, and (z) Debt expressly contemplated by the Budget.

**Section 6.02 <u>Liens</u>.** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any Lien other than (x) Existing Liens and (y) the DIP Liens.

**Section 6.03 <u>Superpriority Claims.</u>** The Debtor shall not (directly or indirectly) incur, create, or permit to exist any administrative-expense claim, expense, or cost (x) with priority senior or equal to the DIP Claims or (y) not expressly contemplated by the Budget.

**Section 6.04 <u>Payments.</u>** The Debtor shall not make any payment (other than in respect of the DIP Obligations) not expressly contemplated by the Budget.

**Section 6.05 <u>Merger or Sale.</u>** The Debtor shall not (directly or indirectly) (x) merge or consolidate with another Person or (y) unless the net proceeds thereof shall be sufficient to repay the DIP Obligations (subject to Section 2.07) in full, sell any DIP Collateral; provided any such sale shall be in Approved Form.

**Section 6.06 <u>Business.</u>** The Debtor shall not engage in any business other than its line of business as of the Petition Date.

**Section 6.07 <u>Amendments to Organizational Documents</u>.** The Debtor shall not amend any corporate-governance or organizational document.

**Section 6.08 <u>Bankruptcy Court Filings.</u>** The Debtor shall not commence any action in, file any motion, application, or proposed order with relating to the DIP Loans or make any other submission to the Bankruptcy Court relating to the DIP Loans other than in Approved Form.

**ARTICLE VII**

**INDEMNIFICATION**

**Section 7.01 <u>Indemnification by the Debtor</u>.** The Debtor shall indemnify the DIP Lender and its Affiliates (expressly including Legalist, Inc. and Legalist DIP GP, LLC), together with their respective partners, directors, officers, managers, members, partners, investors, employees, contractors, agents, administrators, advisors (including attorneys), and representatives, against,

**EXHIBIT PDG001**

and hold each such Person (each an "**Indemnified Person**") harmless from, all liabilities, obligations, losses, damages, penalties, claims, actions, causes of action, judgments, suits, costs, expenses, fees, and disbursements, of any kind or nature whatsoever, whether direct, indirect, special, exemplary, or consequential and whether based on federal, state, foreign, or international laws, statutes, rules, or regulations, that may be imposed on, incurred by, or asserted against such Indemnified Person, in any way arising from, in connection with, or relating to any DIP Loan Document, the transactions contemplated thereby, or any action taken or not taken in connection therewith (collectively, the "**Indemnified Liabilities**"); provided that such indemnity shall not be available to an Indemnified Person to the extent that any Indemnified Liability was a direct result, as determined by a court of competent jurisdiction, in a final and non-appealable order, of the gross negligence or willful misconduct of such Indemnified Person. The Debtor's payment obligations with respect to any Indemnified Liability shall constitute DIP Obligations for all purposes, and each Indemnified Person not a Party shall be a third-party beneficiary of this Agreement for purposes enforcing such obligations.

<u>ARTICLE VIII</u>
**EVENTS OF DEFAULT**

**Section 8.01 <u>Events of Default</u>.** The occurrence and continuation of each of the following shall constitute an "**Event of Default**":

(i)  The Debtor shall:

    (A) Fail to timely pay any DIP Lender Expense or other DIP Obligation;

    (B) Grant or permit to exist any Lien on any DIP Collateral, other than the DIP Liens and Existing Liens;

    (C) Fail to satisfy any Milestone, within five business days of its stated deadline;

    (D) Make any payment not expressly contemplated by, or otherwise fail to comply with, the Budget (subject to Permitted Variances); or

    (E) Fail at any time to satisfy any Cash-Management Requirement;

(ii)  Any representation, warranty, certification, or other statement made, or deemed made in or delivered pursuant to any DIP Loan Document, by the Debtor shall be false in any material respect as of the date so made, deemed made, or delivered;

(iii) The Bankruptcy Court or another court of competent jurisdiction shall enter an order, without the prior written consent of the DIP Lender:

    (A) Granting adequate protection, under Bankruptcy Code section 361, 362, 363, or 364 or otherwise, to any party, except as set forth in the Budget;

    (B) Granting relief from the automatic stay, under Bankruptcy Code section 362 or otherwise, to any party, other than the DIP Lender, with respect to any DIP Collateral;

    (C) Surcharging, under Bankruptcy Code section 506(c) or otherwise, any DIP Collateral in any amount, or subjecting the DIP Lender or DIP Collateral to the equitable principle of marshaling;

    (D) Approving credit or debt (other than the DIP Loans) secured by a Lien, under Bankruptcy Code section 364 or otherwise, on any DIP Collateral;

(E) Approving any administrative-expense claim, expense, or cost against the Debtor (other than the DIP Claims), under Bankruptcy Code section 364, 502, 507, or otherwise, with priority of payment senior or equal to the DIP Claims;

(F) Modifying, staying, vacating, or rescinding any part of any DIP Order;

(G) Holding, adjudicating, or declaring any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender to be invalid, unenforceable, or otherwise subject to question, challenge, or impairment;

(H) Enjoining, restraining, or in any other way preventing a Debtor from conducting any material part its business affairs;

(I) Appointing an examiner or trustee in the Debtor's Case;

(J) Confirming any Chapter 11 plan that does not provide for repayment in full in cash by the Maturity Date of all outstanding DIP Obligations;

(K) Converting the Debtor's Case to a case under Bankruptcy Code chapter 7; or

(L) Dismissing the Debtor's Case;

(iv) The Debtor, or an Affiliate thereof, shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (or join in or otherwise support the same) (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender;

(v) Any party (other than the Debtor or an Affiliate thereof) shall commence any action in, file any motion or application with, or make any other submission to the Bankruptcy Court or another court of competent jurisdiction (x) seeking entry of any order described in the foregoing Clause (iii) or (y) questioning or challenging, or that could be reasonably expected otherwise to impair, any DIP Lien or DIP Claim (or the priority, validity, or enforceability thereof), any DIP Obligation, any DIP Loan Document, or any right or remedy of the DIP Lender; provided that the Debtor has not timely filed a reasonable objection or opposition to such action, motion, or other submission; and

(vi) The Debtor shall fail to perform or comply with any other agreement, covenant, term, or condition in any DIP Loan Document, other than those listed in the preceding Clauses (i)-(v); provided such failure has not been remedied (if capable of remedy) within 21 days of the earlier of (x) the Debtor's becoming aware of such failure or (ii) the Debtor's receipt of written notice from the DIP Lender of such failure.

**Section 8.02 Remedies.**

(a) Subject only to the DIP Order, and notwithstanding Bankruptcy Code section 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of, or application to, the Bankruptcy Court:

(i) Declare the DIP Commitment terminated;

**EXHIBIT PDG001**

(ii) Declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor;

(iii) Terminate the Debtor's access to any DIP Blocked Account; and

(iv) Setoff against any outstanding DIP Obligation all amounts held in the DIP Blocked Accounts (less, cumulatively across such accounts, the amount of the Triggered Carveout Cap (as defined in the DIP Order)).

(b) While any Event of Default has occurred and is continuing, the DIP Lender may move or apply to the Bankruptcy Court for entry of an order:

(i) Terminating the automatic stay with respect to any DIP Collateral;

(ii) Terminating the Debtor's exclusivity to propose a chapter 11 plan;

(iii) Appointing an examiner or chapter 11 trustee; and

(iv) Converting the Debtor's Case to chapter 7.

(c) If the DIP Lender so moves or applies, the Debtor shall be limited to contesting solely whether the Event of Default has occurred and/or is continuing. The Debtor expressly waives the right to contest such relief whatsoever beyond the foregoing limitation.

(d) In addition to the rights and remedies enumerated in the foregoing Clauses (a) and (b), the DIP Lender shall be entitled, while any Event of Default has occurred and is continuing, to pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code.

(e) For the avoidance of doubt, all costs incurred by the DIP Lender in connection with this Section 8.02 shall constitute DIP Lender Expenses and DIP Obligations for all purposes.

**Section 8.03 Application of Funds.** If the DIP Lender receives any payment from or on behalf of the Debtor, or collects any money or property pursuant to this Article VIII, it shall pay out the money or property as follows:

(i) First: To the DIP Lender, for accrued and unpaid DIP Lender Expenses;

(ii) Second: To the DIP Lender, for accrued and unpaid interest (including default interest) and applicable fees;

(iii) Third: To the DIP Lender, for unpaid principal outstanding on the DIP Loans;

(iv) Fourth: To the DIP Lender, for all other unpaid DIP Obligations (including reasonable reserves for Indemnified Liabilities and other contingent DIP Obligations); and

(v) Fifth: After all DIP Obligations (including reasonable reserves) have been indefeasibly paid in full in cash and the DIP Commitment has terminated, the DIP Lender shall distribute any surplus in accordance with a final, non-appealable Bankruptcy Court order.

For the avoidance of doubt, the Debtor shall remain liable for any deficiency.

**ARTICLE IX**
**[OMITTED]**

**EXHIBIT PDG001**

### ARTICLE X
### COLLATERAL, SECURITY, AND PRIORITY

**Section 10.01 <u>DIP Claims.</u>** The Debtor covenants, represents, and warrants that, upon entry of the DIP Order, all DIP Obligations shall, pursuant to Bankruptcy Code section 364(c)(1), constitute DIP Claims, payable from and having recourse to all property of the Debtor's estates (expressly including all DIP Collateral).

**Section 10.02 <u>Grant of Security Interest.</u>** Subject to the priorities set forth in Section 10.03, as to all DIP Collateral, the Debtor assigns and conveys as security, grants a security interest in and Lien on, hypothecates, mortgages, pledges, and sets over and unto the DIP Lender all right, title, and interest of the Debtor in the DIP Collateral (collectively, the "**DIP Liens**"), including all Avoidance Actions, but excluding the Carve Out. The Debtor acknowledges that, pursuant to the DIP Order, the DIP Liens granted to the DIP Lender in all DIP Collateral shall be automatically perfected without reference to any notice or recordation requirements of non-bankruptcy law.

**Section 10.03 <u>DIP Liens.</u>** The Debtor covenants, represents, and warrants that, upon entry of DIP Order, the DIP Liens shall compromise:

(i)  Pursuant to Bankruptcy Code section 364(c)(2), an automatically perfected, senior DIP Lien on all DIP Collateral not subject to Existing Liens;

(ii) Pursuant to Bankruptcy Code section 364(c)(3), an automatically perfected, junior DIP Liens on all DIP Collateral subject to Existing Liens;

(iii)Pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, equal DIP Liens on all DIP Collateral subject to Existing Liens, other than Permitted Senior Liens; and

(iv)Pursuant to Bankruptcy Code section 364(d)(1), an automatically perfected, senior DIP Liens on all DIP Collateral subject to Existing Liens, other than Permitted Senior Liens.

**Section 10.04 <u>Further Assurances.</u>** The Debtor further agrees that, if requested by the DIP Lender, it shall enter into any separate security agreement, control agreement, pledge agreement, or other similar documentation or instrument with respect to any DIP Collateral that the DIP Lender may request, all expenses of which incurred by the DIP Lender shall constitute DIP Lender Expenses.

### ARTICLE XI
### MISCELLANEOUS

**Section 11.01 <u>Amendments and Waivers.</u>** No amendment, modification, termination, or waiver of any provision hereof, or consent to any departure by the Debtor therefrom, shall be effective without the express written consent of the DIP Lender. Any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Debtor in any given instance shall entitle the Debtor to any other or further notice or demand in similar or other circumstances.

**Section 11.02 <u>Notices.</u>** All notices, requests, demands, and other communications under any DIP Loan Document shall be in writing, delivered by electronic mail as follows, and deemed effective upon delivery:

(i)  If to the Debtor:

   Attn: Michael Dixson (mike@pdgnm.com)

13

With a copy (which shall not constitute notice) to:

Weycer Kaplan Pulaski & Zuber, P.C.
Attn: Jeff Carruth, Esq. (jcarruth@wkpz.com)

(ii) If to the DIP Lender:

c/o Legalist, Inc. (dip@legalist.com).

**Section 11.03 <u>DIP Lender Expenses</u>.** Whether or not the transactions contemplated hereby are consummated or any DIP Loan is made, the Debtor agrees to pay promptly all costs and expenses of the DIP Lender incurred in connection with, arising from, or relating to the Debtor or its Case, the DIP Loan Documents, and any exercise of rights or remedies thereunder, whether before or after the date hereof and irrespective of the occurrence of any default or Event of Default, including (without limitation) all costs of inhouse counsel, advisers, and consultants of DIP Lender, together all fees, expenses, and disbursements of outside counsel or other advisers and consultants retained by the DIP Lender with respect thereto (collectively, the "DIP Lender Expenses"), which shall constitute DIP Obligations for all purposes hereunder. The foregoing shall be in addition to, and shall not limit, any other provision of the DIP Loan Documents regarding DIP Obligations to be paid by the Debtor.

**Section 11.04 <u>Enforceability; Successors and Assigns.</u>** This Agreement shall be binding on and inure to the benefit of, and shall be enforceable by, the respective successors and permitted assigns of the Parties. No Debtor may assign any DIP Loan Document without the DIP Lender's prior written consent. Any such alleged assignment shall be void ab initio and shall not relieve the Debtor of any obligation thereunder.

**Section 11.05 <u>Integration.</u>** The DIP Loan Documents contain and constitute the entire agreement of the Parties with respect to the subject matter thereof and supersede all prior negotiations, agreements, and understandings, whether written or oral.

**Section 11.06 <u>No Waiver; Remedies Cumulative</u>**. No failure or delay by the DIP Lender in exercising any right, power, or privilege hereunder shall operate as a waiver thereof. A single or partial exercise of any right, power, or privilege shall not preclude any other or further exercise of the same or another right, power, or privilege. The rights and remedies provided in the DIP Loan Documents shall be cumulative and not exclusive of any right or remedy provided by law or equity or otherwise available.

**Section 11.07 <u>Submission to Jurisdiction.</u>** Each Party agrees that any action with respect to any DIP Loan Document shall be brought exclusively in the Bankruptcy Court and unconditionally submits to the Bankruptcy Court's jurisdiction regarding the same.

**Section 11.08 <u>Governing Law</u>.** The DIP Loan Documents, and any dispute arising therefrom, shall be governed by the Bankruptcy Code and, to the extend not preempted thereby, New York state law. This Agreement constitutes an instrument for the payment of money only, within the meaning of N.Y. C.P.L.R. § 3213. Any reference herein to the "Uniform Commercial Code" refers to the New York Uniform Commercial Code as in effect from time to time.

**Section 11.09** WAIVER OF JURY TRIAL. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY IN ANY DISPUTE ARISING FROM THIS AGREEMENT.

**EXHIBIT PDG001**

**Section 11.10 <u>Severability</u>.** If any term of any DIP Loan Document is held invalid, illegal, or incapable of being enforced by any rule of law or public policy, all terms of such DIP Loan Document shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated thereby is not affected in any manner adverse to any party thereto. Upon such holding, the Parties shall negotiate in good faith to modify the same such that the transactions contemplated thereby are fulfilled to the maximum extent possible.

**Section 11.11 <u>Survival</u>.** All representations, warranties, covenants, and agreements made by the Debtor in any DIP Loan Document shall survive until full and indefeasible payment of all DIP Obligations, irrespective of any earlier default, Event of Default, acceleration, or termination thereunder; provided that Article VII and Section 11.3 shall survive such full and indefeasible payment of all DIP Obligations.

**Section 11.12 <u>Maximum Lawful Interest.</u>** Notwithstanding anything to the contrary herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final and non-appealable order, deem applicable. The Debtor and the DIP Lender, in executing and delivering this Agreement, intend legally to agree on the rate or rates of interest and other charges for the use of money and manner of payment permitted by such law; provided that, if such amount exceeds such maximum allowable amount, then the Debtor is and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Debtor in excess of such legal maximum shall be applied to reduce the principal balance of the DIP Loans to the extent of any such excess.

**Section 11.13 <u>Foreseeable Circumstances.</u>** The Parties acknowledge that (x) the COVID-19 pandemic any/or other instances of pandemic or widespread virus or infection and (y) ongoing riots, insurrections, terrorist acts, and/or other domestic unrest and uncertainty shall not be considered unforeseeable circumstances for purposes of this Agreement. The Parties agree that any claim of unenforceability, force majeure, or other claim and/or defense related to the foregoing (including with respect to any court closure) is expressly waived.

**Section 11.14 <u>Execution in Counterparts.</u>** Each DIP Loan Document may be executed, including electronically, in any number of counterparts and by different Parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same DIP Loan Document.

**Section 11.15 <u>PPP and Similar Funding.</u>** Nothing contained herein prohibits the Debtor from seeking, and no pre-approve or further approval is required with respect to, any unsecured loan from the United States Government for which the Debtor is or could become eligible so long as any such loan is unsecured and does not impair the DIP Obligations, the DIP Liens, and/or the DIP Collateral.

**Section 11.16 <u>No Default Upon Certain Events.</u>  FOR THE AVOIDANCE OF DOUBT, THE CONFIRMATION OF A CHAPTER 11 PLAN SHALL NOT ALTER THE MATURITY DATE AND SHALL NOT CONSTITUTE AN EVENT OF DEFAULT UNDER THIS DIP CREDIT AGREEMENT.  THIS SECTION 11.16 CONTROLS OVER ANY PROVISIONS ABOVE TO THE CONTRARY.**

 **<u>Not Single Asset Debtor.</u>**    The DIP Lender shall not assert the Debtor is a "single asset real estate" type of debtor nor assert any rights or seek any relief with respect to Code §362(d)(3).

**EXHIBIT PDG001**

\*          \*          \*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized signatories as of the date first written above.

**DEBTOR:**

PDG PRESTIGE, INC.

By: _____

Name: Michael Dixson

Title: President

**DIP LENDER:**

LEGALIST DIP GP, LLC, as general partner of
Legalist DIP Fund I, LP and Legalist DIP SPV II, LP

By: _____

Name: Christian G.B. Haigh

Title: Managing Member

**Schedule 1**

**(Milestones)**

| Event | Deadline |
|---|---|
| Entry of DIP Order | 04/30 |
| Filing of Sale Motion and/or Plan | +90 days |
| Entry of Sale Order and/or Confirmation Order | +180 days |
| Maturity Date | +270 days |

**Schedule 2**

**(Existing Liens)**

| Instrument No. (all Dona Luna County, NM) | Type of Interest or Instrument | Claimant | Amount Asserted |
|---|---|---|---|
| 2107552 | Lien claim | New Mexico Real Estate Advisors, Inc. | $95,145.76 |
| 2102435 | Lien claim | New Mexico Real Estate Advisors, Inc. | $75,136.02 |
| 2102434 | Lien claim | New Mexico Real Estate Advisors, Inc. | $20,194.20 |
| 2102433 | Lien claim | New Mexico Real Estate Advisors, Inc. | $52,103.62 |
| 2102432 | Lien claim | New Mexico Real Estate Advisors, Inc. | $95,145.76 |
| 2102870 | Notice of Lis Pendens | Dennis Crimmins | n/a |
| 2104066 | Notice of Lis Pendens | Springer Management of Las Cruces LLC | n/a |

**Schedule 3**

**(Permitted Senior Liens)**

**None.**

EXHIBIT PDG001

**<u>Schedule 4</u>**

**(Excluded Collateral)**

**The "Carveout" as defined above.**

**Exhibit A**
**(Form of Borrowing Request)**

Legalist DIP Fund I, LP
c/o Legalist, Inc. (dip@legalist.com)

RE:      *In re PDG Prestige, Inc.*, Case No. 21-30107

Ladies and Gentlemen:

This Borrowing Request is delivered to you pursuant to Article III of the Debtor-in-Possession Term Loan Credit Agreement, dated as of _____ (as in effect from time to time, the "Credit Agreement"), among PDG Prestige, Inc. (the "Debtor") and the addressee hereof (the "DIP Lender"). The Debtor acknowledges that this Borrowing Request is a DIP Loan Document for all purposes. Capitalized term used but not defined herein have the meanings given to them in the Credit Agreement

The Borrower hereby requests that a DIP Loan be made to it in the aggregate principal amount of $_____ (the "DIP Draw").

The Debtor hereby acknowledges that, pursuant to Credit Agreement Section 3.01(v), each of the representations and warranties set forth in the Credit Agreement and in each other DIP Loan Document shall be true and correct as of the date hereof, except to the extent that any such representation or warranty expressly relates to an earlier date, in which case each such representation and/or warranty shall have been true and correct as of such earlier date. The Debtor agrees that if, at any time prior to the time the DIP Draw is funded by the DIP Lender, any matter certified to herein by it will not be true and correct in all material respects at such time as if then made, it will immediately so notify the DIP Lender.

Please wire transfer the proceeds of the DIP Draw as follows:

Name: _____
ABA No.: _____
Account No.: _____


Very truly yours,

PDG PRESTIGE, INC.

By: _____
Name: Michael Dixson
Title: President

**Exhibit B**
**(Budget)**

| PDG Prestige Inc. | DRAFT - NO ADMISSION OF LIABILITY | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13 Week | | | | | | | | | | | | | | |
| Week: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Receipts** | | | | | | | | | | | | | | |
| Operating income | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 | 10,192 | 10,192 | 10,192 | 10,192 | |
| Asset sales | 0 | 0 | 0 | 0 | 0 | 2,800,000 | 0 | 0 | 0 | 0 | 0 | 0 | 6,000,000 | 8,800,000 |
| DIP proceeds | 3,300,190 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 115,000 | 135,000 | 4,700,190 |
| **Total Cash Receipts** | 3,302,890 | 117,700 | 117,700 | 117,700 | 117,700 | 2,917,700 | 117,700 | 117,700 | 117,700 | 125,192 | 125,192 | 125,192 | 6,145,192 | |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Land Payoff City Bank | 2,750,000 | | | | | | | | | | | | | |
| NMREA | 142,810 | | | | | | | | | | | | | |
| Hard Costs Lot 1 A 400,000 | 100,000 | 100,000 | 100,000 | 100,000 | | | | | | | 0 | 0 | 0 | |
| Site Costs Lot 3A | 140,000 | 100,000 | 100,000 | 100,000 | 100,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Shell Building Lot 3A | | 0 | 0 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 0 | 0 | |
| **Total Operating Expenses** | 3,132,810 | 200,000 | 200,000 | 300,000 | 200,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 0 | 0 | |
| **Professional Fees/Administrative Expenses** | | | | | | | | | | | | | | |
| Soft Costs 250000 | 50,000 | 50,000 | 25,000 | 25,000 | 25,000 | 25,000 | 50,000 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Developer Fee / G&A 150000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 0 | 0 | | |
| Interest Reserve 200000 | 15,380 | 15,380 | 15,380 | 15,380 | 15,380 | 15,380 | 15,380 | 15,380 | 15,380 | 15,380 | 15,380 | 15,380 | 15,380 | |
| WKPZ Carveout | 40,000 | | | | | | | | | | | | | |
| Trustee Payment 1% | 47,000 | | | | | | | | | | | | | |
| **Total Professional Fees/Administrative Expenses** | 167,380 | 80,380 | 55,380 | 55,380 | 55,380 | 55,380 | 80,380 | 30,380 | 30,380 | 30,380 | 15,380 | 15,380 | 15,380 | |
| **Total Disbursements** | 3,300,190 | 280,380 | 255,380 | 355,380 | 255,380 | 155,380 | 180,380 | 130,380 | 130,380 | 130,380 | 115,380 | 15,380 | 15,380 | |
| **Net cash flow** | 2,700 | (162,680) | (137,680) | (237,680) | (137,680) | 2,762,320 | (62,680) | (12,680) | (12,680) | (5,188) | 9,812 | 109,812 | 6,129,812 | |

**EXHIBIT PDG002**

| BANKRUPTCY LOCAL RULES — EXHIBIT J CHECKLIST | |
|---|---|
| **Item** | **Response** |
| **1. Identification of Proceedings:** | |
| (a) Preliminary or final motion/order (circle one) | Final. |
| (b) Continuing use of cash collateral (§ 363) | Not applicable. |
| (c) New financing (§ 364) | New financing. |
| (d) Combination of §§ 363 and 364 financing | Not applicable |
| (e) Emergency hearing (immediate and irreparable harm) | Emergency hearing, final order. |
| **2. Stipulations:** | |
| (a) Brief history of debtor's businesses and status of debtor's prior relationships with lender | No pre-petition relationship. |
| (b) Brief statement of purpose and necessity of financing | Payoff pre-petition first lien financing (City Bank).  (2) Execute development plan. |
| (c) Brief statement of type of financing (i.e., accounts receivable, inventory) | Advances as set forth in the budget, large single advance. |
| **(d) Are lender's pre-petition security interest(s) and liens deemed valid, fully perfected and non-avoidable | Not applicable. |
| (i) Are there provisions to allow for objections to above? | Not applicable. |
| (e) Is there a post-petition financing agreement between lender and debtor? | Yes |
| (i) If so, is agreement attached? | Yes |
| **(f) If there is an agreement are lender's post-petition security interests and liens deemed valid, fully perfected and non-avoidable? | Yes |
| (g) Is lender undersecured or oversecured? (circle one) | Lender will become over-secured as Debtor implements development plan. |
| (h) Has lender's non-cash collateral been appraised? | Yes |
| (i) Insert date of latest appraisal | September 10, 2019 performed by Colliers International for 550 S. Telshor blvd and November 2019 performed by CBRE Dallas for 510 S. Telshor Blvd |
| (i) Is debtor's proposed budget attached? | Yes. |
| (j) Are all pre-petition loan documents identified? | Not applicable. |
| (k) Are pre-petition liens on single or multiple assets? (circle one) | Not applicable. |

## EXHIBIT PDG002

| BANKRUPTCY LOCAL RULES — EXHIBIT J CHECKLIST ||
|---|---|
| **Item** | **Response** |
| (l) Are there pre-petition guaranties of debt? | Not applicable. |
| (i) Limited or unlimited? (circle one) | Not applicable. |
| **3. Grant of Liens:** | |
| *(a) Do post-petition liens secure pre-petition debts? | No; however, DIP facility will extinguish City Bank first lien debt and broker second lien debt. |
| *(b) Is there cross-collateralization? | Not applicable. |
| **(c) Is the priority of post-petition liens equal to or higher than existing liens? | Higher. |
| **(d) Do post-petition liens have retroactive effect? | No. |
| (e) Are there restrictions on granting further liens or liens of equal or higher priority? | Yes. |
| *(f) Is lender given liens on claims under §§ 506(c), 544-50 and§§ 522? | Yes. |
| **(i) Are lender's attorney's fees to be paid? | Yes, indirectly through Fees in the DIP Credit Agreement. |
| (ii) Are debtor's attorney's fees excepted from § 506(c)? | Yes |
| * (g) Is lender given liens upon proceeds of causes of action under§§ 544, 547 and 548? | Yes |
| **4. Administrative Priority Claims:** | |
| (a) Is lender given an administrative priority? | Yes |
| (b) Is administrative priority higher than § 507(a)? | Yes |
| (c) Is there a conversion of pre-petition secured claim to post-petition administrative claim by virtue of use of existing collateral? | Not applicable. |
| **5. Adequate Protection (§ 361):** | |
| (a) Is there post-petition debt service? | Yes upon sales of collateral. |
| (b) Is mere a replacement/addition 361(l) lien? (circle one or both) | No. |
| ** (c) Is the lender's claim given super-priority? (§ 364(c) or (d)) | §364(d) |
| (d) Are there guaranties? | No. |
| (e) Is there adequate insurance coverage? | Not applicable. |
| (f) Other? | Not applicable. |

**EXHIBIT PDG002**

| BANKRUPTCY LOCAL RULES — EXHIBIT J CHECKLIST | |
|---|---|
| **Item** | **Response** |
| **6. Waiver/Release Claims v. Lender:** | |
| ** (a) Debtor waives or release claims against lender, including, but not limited to, claims under §§ 506(c), 544-550, 552, and 553 of the Code? | Not applicable. |
| **(b) Does the debtor waive defenses to claim or liens of lender? | Yes. |
| **7. Source of Post-Petition Financing (§ 364 Financing):** | |
| (a) Is the proposed lender also the pre-petition lender? | No. |
| (b) New post-petition lender? | Yes. |
| (c) Is the lender an insider? | No. |
| **8. Modification of Stay:** | |
| **(a) Is any modified lift of stay allowed? | Yes |
| **(b) Will the automatic stay be lifted to permit lender to exercise self-help upon default without further order? | Yes |
| (c) Are there any other remedies exercisable without further order of the Court? | No |
| (d) Is there a provision that any future modification of order shall not affect status of debtor's post-petition obligations to lender? | No |
| **9. Creditors' Committee:** | |
| (a) Has creditors' committee been appointed? | No. |
| (b) Does creditors' committee approve of proposed financing? | Not applicable. |
| **10. Restrictions on Parties in Interest:** | |
| **(a) Is a plan proponent restricted in any manner, concerning modification of lender's rights, liens and/or causes? | Partial – DIP Lender must approve any motion or pleading that would affect the DIP Loan.. |
| **(b) Is the debtor prohibited from seeking to enjoin the lender in pursuant of rights? | No |
| **(c) Is any party in interest prohibited from seeking to modify this order? | No. |
| (d) Is the entry of any order conditioned upon payment of debt to lender? | No. |

**EXHIBIT PDG002**

| BANKRUPTCY LOCAL RULES — EXHIBIT J CHECKLIST | |
| --- | --- |
| **Item** | **Response** |
| (e) Is the order binding on subsequent trustee on conversion? | Yes. |
| **11. Nunc Pro Tunc:** | |
| (a) Does any provision have retroactive effect? | No. |
| **12. Notice and Other Procedures:** | |
| (a) Is shortened notice requested? | Yes |
| (b) Is notice requested to shortened list? | No. |
| (c) Is time to respond to be shortened? | Yes. |
| (d) If final order sought, have 14 days elapsed since service of motion pursuant to Rule 4001(b)(2)? | Yes, will have by time of motion. |
| (e) If preliminary order sought, is cash collateral necessary to avoid immediate and irreparable harm to the estate pending a final hearing? | No. |
| (f) Is a Certificate of Conference included? | Yes |
| (g) Is a Certificate of Service included? | Yes |
| (h) Is there verification of transmittal to U.S. Trustee included pursuant to Rule 9034? | Yes |
| (i) Has an agreement been reached subsequent to filing motion? | No. |
| (i) If so, has notice of the agreement been served pursuant to Rule 4001(d)(4)? | Not applicable. |
| (ii) Is the agreement in settlement of motion pursuant to Rule4001(d)(4)? | Not applicable. |
| (iii) Does the motion afford reasonable notice of material provisions of agreement pursuant to Rule 4001(d)(4)? | Yes. |
| (iv) Does the motion provide for opportunity for hearing pursuant to Rule 9014? | Yes. |

**EXHIBIT PDG003**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| PDG PRESTIGE, INC., | § | Case No. 21-30107 |
| | § | |
| Debtor. | § | |
| | § | |

**FINAL ORDER GRANTING MOTION OF DEBTOR TO (I) ENTER INTO DEBTOR POSSESSION CREDIT AGREEMENT, (II) GRANT PRIMING LIENS UNDER CODE SEC. 364(D), AND (III) PROVIDE RELATED RELIEF (RE: DOCKET NO. ___)**

On this day came on for consideration the *Motion to (I) Enter into Debtor Possession Credit Agreement, (II) Grant Priming Liens Under Code Sec. 364(d), and (III) Provide Related Relief* (Docket No. ___) (the "DIP Motion") filed herein on March 26, 2021 by PDG-Prestige, Inc., debtor and debtor in possession (the "Debtor" or "PDG") seeking entry of a final order for, *inter alia*:

1. authorizing the Debtor to obtain postpetition financing, consisting of senior secured superpriority term loans (the "DIP Loans") in an aggregate maximum amount of $4,700,000 (the "DIP Commitment"), from certain investment fund(s) for which Legalist DIP GP, LLC serves as general partner (as lender, agent, and collateral agent, the "DIP Lender"), as provided in that certain Debtor-in-Possession Term Loan Credit Agreement, dated as of the date hereof, among the Debtor and the DIP Lender (the "DIP Credit Agreement"), which DIP Credit Agreement was attached to the DIP Motion, and to incur the DIP Obligations contemplated thereby;

**EXHIBIT PDG003**

2.    authorizing the Debtor to execute and enter into, and to perform all acts necessary or desirable to consummate the transactions contemplated by, the DIP Credit Agreement and other DIP Loan Documents;

3.    authorizing the Debtor to use the proceeds of the DIP Loans, as permitted in the DIP Loan Documents;

4.    providing that all DIP Obligations shall, pursuant to Section 364(c)(1) of Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Code"), constitute DIP Claims, payable from and having recourse to all property of the Debtor's estate;

5.    authorizing the Debtor to grant the DIP Lender automatically perfected DIP Liens (as defined below) in all DIP Collateral to secure pay of all DIP Obligations, comprising:

(i)    pursuant to Code § 364(c)(2), senior DIP Liens on all DIP Collateral not subject to Existing Liens;

(ii)    pursuant to Code § 364(c)(3), junior DIP Liens on all DIP Collateral subject to Existing Liens;

(iii)    pursuant to Code § 364(d)(1), equal DIP Liens on all DIP Collateral subject to Existing Liens, other than Permitted Senior Liens; and

(iv)    pursuant to Code § 364(d)(1), senior DIP Liens on all DIP Collateral subject to Existing Liens, other than Permitted Senior Liens;

6.    vacating and/or modifying the automatic stay, pursuant to Code § 362, to the extent necessary to (x) consummate the transactions contemplated by the DIP Loan Documents and (y) permit the DIP Lender to exercise any right or remedy provided therein;

7.    approving all Cash-Management Requirements and the Debtor's entry into the cash-management arrangements and DIP Blocked Account control agreements contemplated thereby; and

8.    granting the Debtor such other and further relief as is just and proper.

The Court finds and concludes that the Motion contained the appropriate notices under the Bankruptcy Local Rules; according to the certificate of service attached to the Motion, the Motion was served upon the parties entitled to receive notice under the Bankruptcy Local Rules; no party in interest filed a response or objection to the Motion or any such response or objection is overruled by this Order; and that upon review of the record of this case and with respect to the Motion that cause exists to grant the relief requested therein.

All capitalized terms shall have the same meaning as ascribed to such terms in the Motion, unless otherwise defined herein.

## EXHIBIT PDG003

**THE COURT HEREBY FINDS AND CONCLUDES THAT:**

1.     On February 15, 2021 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under Chapter 11 of the Code.

2.     This Court has jurisdiction over the Case and the Motion under 28 U.S.C. §§ 157(b) and 1334, this matter is a core proceeding under 28 U.S.C. § 157(b)(2), venue is proper under 28 U.S.C. §§ 1408 and 1409, and the Court has authority to enter this Final DIP Order consistent with Article III of the United States Constitution.

3.     An immediate and ongoing need exists for the Debtor to obtain postpetition financing in the amount of the DIP Commitment to reorganize under Bankruptcy Code Chapter 11, and the Debtor does not otherwise have sufficient funds available to pay administrative expenses in this Case.

4.     The Debtor is unable to obtain unsecured credit under Code § 503 or other postpetition financing in the amount of the DIP Commitment on terms more favorable than those provided by the DIP Lender.

5.     sufficient and adequate notice of the Motion and entry of this Final DIP Order has been given under Code § 364 and Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") 2002 and 4001, such that no other or further notice of the Motion or entry of this Final DIP Order is needed.

6.     The terms of the DIP Loans, as set forth in the DIP Loan Documents, have been negotiated in good faith and at arm's length between the Debtor and DIP Lender, and the DIP Lender is entitled to the protections of Code § 364(e) with respect to all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, DIP Loan Documents, and rights and remedies of the DIP Lender.

7.     The terms of the DIP Loans, as set forth in the DIP Loan Documents, are fair and reasonable and reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and the DIP Lender has provided fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the DIP Liens, DIP Claims, and all other rights, protections, and benefits obtained by it under any DIP Loan Document.

8.     Entry of this Final DIP Order is in the best interests of the Debtor's estate and its various stakeholders because it will, inter alia, allow the Debtor to reorganize under Bankruptcy Chapter 11 of the Code; and

9.     The DIP Lender is willing to provide the DIP Loans to the Debtor, but only on the terms of the DIP Loan Documents.

10.     By stipulation with the DIP Lender, the DIP Lender is not a "single asset real estate" type of debtor was defined in Code § 101(51B).

**EXHIBIT PDG003**

**IT IS THEREFORE ORDERED THAT:**

1.  Any remaining objection to the Motion or entry of this Final DIP Order is hereby OVERRULED and the DIP Motion is GRANTED as set forth below.

2.  The execution and delivery of the DIP Credit Agreement and all other DIP Loan Documents by the Debtor is authorized and approved, and the Debtor is authorized and empowered to (x) execute and deliver to the DIP Lender all other documents and instruments necessary or desirable to consummate the transactions contemplated thereby, (y) take all other actions necessary or desirable to carry out the intent and purpose of the DIP Loan Documents, and (z) otherwise comply with the DIP Loan Documents and all requests of the DIP Lender thereunder.

3.  The Debtor is authorized to borrow up to the full amount of the DIP Commitment in DIP Loans in one or more DIP Draws on the terms of the DIP Loan Documents, without application to or further order by the Court.

4.  All interest, fees, and expenses (expressly including all DIP Lender Expenses) contemplated by the DIP Loan Documents are authorized to be incurred by the Debtor as DIP Obligations and approved for payment as DIP Claims, without application to or further order by the Court.

5.  All DIP Obligations, pursuant to Code § 364(c)(1), constitute DIP Claims, payable from and having recourse to all property of the Debtor's estate (expressly including all DIP Collateral).

6.  The DIP Lender holds security interests in and liens on all DIP Collateral, which the Debtor has (to the extent of its right, title, and interest therein) assigned and conveyed as security, hypothecated, mortgaged, pledged, and set over and unto the DIP Lender, and which have been automatically perfected notwithstanding any notice or recordation requirements of non-bankruptcy law (collectively, the "DIP Liens"), comprising:

    a.  Pursuant to Code § 364(c)(2), senior DIP Liens on all DIP Collateral not subject to Existing Liens;

    b.  Pursuant to Code § 364(c)(3), junior DIP Liens on all DIP Collateral subject to Existing Liens;

    c.  Pursuant to Code § 364(d)(1), equal DIP Liens on all DIP Collateral subject to Existing Liens, other than Permitted Senior Liens; and

    d.  Pursuant to Code § 364(d)(1), senior DIP Liens on all DIP Collateral subject to Existing Liens, other than Permitted Senior Liens.

7.  The proceeds of the DIP Loans shall be used by the Debtor exclusively to (a) pay DIP Lender Expenses, (b) pay all other DIP Obligations, and (c) pay other

**EXHIBIT PDG003**

amounts permitted under the Budget; provided that no portion of the DIP Loans shall be used for fees, costs, or expenses incurred by any party in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Loan, DIP Lien, DIP Claim, DIP Obligation, DIP Loan Document, or right or remedy of the DIP Lender.

8. So long as any DIP Obligation remains outstanding, the Debtor shall perform each covenant contained in the DIP Loan Documents (other than those covenants that, under the DIP Loan Documents, shall survive full and indefeasible payment of the DIP Obligations).

9. The DIP Loans shall mature, and all DIP Obligations shall be immediately due and payable upon the Maturity Date.

10. An Event of Default shall exist during the occurrence and continuation of each of the events so identified in the DIP Loan Documents.

11. Notwithstanding Code § 362, while any Event of Default has occurred and is continuing, the DIP Lender may immediately, without further order of or application to the Bankruptcy Court:

    a. declare the DIP Commitment terminated;

    b. declare all DIP Obligations immediately due and payable, without the requirement of presentment, demand, protest, or any other notice, all of which are waived by the Debtor;

    c. terminate the Debtor's access to any DIP Blocked Account; and

    d. set off against any outstanding DIP Obligation all amounts held in the DIP Blocked Accounts (less, cumulatively across such accounts, the amount of the Triggered Carveout Cap (as defined below)).

12. Furthermore, while any Event of Default has occurred and is continuing, the DIP Lender may move or apply to the Bankruptcy Court for entry of an order:

    a. terminating the automatic stay with respect to any DIP Collateral;

    b. terminating the Debtor's exclusivity to propose Chapter 11 plan;

    c. appointing an examiner or Chapter 11 trustee; and

    d. converting the Debtor's Case to Chapter 7;

provided that if the DIP Lender so moves or applies, the Debtor shall be limited to contesting solely whether the Event of Default has occurred and/or is continuing,

**EXHIBIT PDG003**

and the Debtor has expressly waived the right to contest such relief whatsoever beyond the foregoing limitation.

13.     In addition to the rights and remedies enumerated in Paragraphs 11 and 12, the DIP Lender shall be entitled, while any Event of Default has occurred and is continuing, to pursue all rights and remedies available to it under the Bankruptcy Code (whether as a creditor, party in interest, or otherwise) or as a secured party under the Uniform Commercial Code. For the avoidance of doubt, all costs incurred by the DIP Lender in connection any default or Event of Default under any DIP Loan Document shall constitute DIP Lender Expenses and DIP Obligations for all purposes.

14.     In consideration of the DIP Lender's (x) consent to the current payment of administrative expenses of the Debtor's estate to the extent of the Budget and (y) concessions with respect to the Carveout (defined below), as described Paragraph 15, the DIP Lender is entitled to a full and complete waiver, with respect to all parties, of Code § 506(c) and in no event shall any the DIP Lender or DIP Collateral be subject to any "surcharge" or the doctrine of "marshalling" by any party in any way whatsoever.

15.     Unless and until the Carveout Trigger Date (defined below), the Debtor shall pay administrative expenses of the Case in the ordinary course as permitted by the Budget (including the fees of counsel of the Debtor as approved by the Court on an interim and/or final basis). Notwithstanding the Budget or anything else herein or in any other DIP Loan Document to the contrary, from and after the date of delivery (the "Carveout Trigger Date") by the DIP Lender to the counsel to the Debtor and the Office of the United States Trustee (the "UST") of notice that both (a) an Event of Default has occurred and is continuing and (b) the DIP Lender has triggered the Carveout (a "Carveout Trigger Notice"), such administrative expenses shall be funded solely from an amount (the "Carveout"), not to exceed 2.50% of the DIP Loans then outstanding, to be set aside solely for (x) fees, expenses, and costs then due and payable to the UST and/or Clerk of the Court under 28 U.S.C. § 1930 plus (y) potential future fees, expenses, and costs of a statutory trustee appointed in the Debtor's case (together, the "Triggered Carveout Cap"); provided that in no event shall:

   a.     payment of any amount contemplated by the Carveout or any portion of the Triggered Carveout Cap constitute a personal liability of the DIP Lender, any Affiliate, or any other Indemnified Person; or

   b.     any such amount be used to fund fees, costs, or expenses incurred in (x) investigating or pursuing any claim or cause of action against the DIP Lender, any Affiliate thereof, or any other Indemnified Person or (y) questioning or challenging, or taking any other action that could reasonably be expected otherwise to impair, any DIP Loan, DIP Lien, DIP

**EXHIBIT PDG003**

Claim, DIP Obligation, DIP Loan Document, or right or remedy of the DIP Lender.

For the avoidance of doubt, from and after the Carveout Trigger Date, the Debtor shall pay administrative expenses (irrespective of when incurred) solely as permitted under the Carveout.

16. The automatic stay imposed by Code § 362(a) is and shall remain modified to the extent necessary to implement and effectuate in full this Final DIP Order and the other DIP Loan Documents (expressly including any exercise of rights and remedies by the DIP Lender) and the transactions contemplated thereby.

17. Any stay, modification, reversal, or vacation of this Final DIP Order shall not, in any way whatsoever, affect any DIP Loan, DIP Lien, DIP Claim, DIP Obligation, other DIP Loan Document, or right or remedy of the DIP Lender. Notwithstanding any such stay, modification, reversal, or vacation, all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, other DIP Loan Documents, and rights and remedies of the DIP Lender made, available, and/or in effect prior to the effective date of such stay, modification, reversal, or vacation shall be governed in all respects by this Final DIP Order as originally entered by the Court. The DIP Lender is entitled to and shall have in all cases the protections of Code § 364(e) with respect to all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, other DIP Loan Documents, and rights and remedies and shall be so protected notwithstanding any stay, modification, reversal, or vacation of this Final DIP Order.

18. This Final DIP Order shall survive entry of any order, in this Court or any other court of competent jurisdiction, (w) confirming a Chapter 11 plan (and, to the extent not satisfied in full in cash on the effective date thereof, the DIP Obligations shall not be discharged under or by entry of such order, notwithstanding Code § 1141(d)), (x) appointing an examiner or Chapter 11 trustee, (y) converting the Case to a case under Bankruptcy Code Chapter 7, or (z) dismissing the Case. This Final DIP Order, together with all DIP Loans, DIP Liens, DIP Claims, DIP Obligations, other DIP Loan Documents, and rights and remedies of the DIP Lender shall continue in full force and effect, notwithstanding the entry of any such order, until full and indefeasible payment of all DIP Obligations.

19. In the event of any inconsistency between any other DIP Loan Document and this Final DIP Order, the terms hereof shall govern.

20. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9014, or anything else in the Bankruptcy Rules or any other applicable rule of procedure, this Final DIP Order shall be valid, take full effect, and be enforceable immediately upon entry hereof. There shall be no stay of execution or effectiveness of this Final DIP Order, all of which are hereby waived for cause shown.

**EXHIBIT PDG003**

21.    The Court has and shall retain jurisdiction to enforce this Final DIP Order, including to hear any motion or application by the DIP Lender related hereto or to any other DIP Loan Document, according to its terms.

**22.    NO LIEN GRANTED HEREIN TO THE DIP LENDER SHALL PRIME ANY STATUTORY LIEN OF ANY GOVERNMENTAL UNIT FOR AD VALOREM PROPERTY TAXES.**

23.    The DIP Lender shall not assert the Debtor is a "single asset real estate" type of debtor nor assert any rights or seek any relief with respect to Code §362(d)(3).

24.    The Debtor is authorized upon the Effective Date of the DIP Loan to advance to proposed counsel for the Debtor and/or counsel employed by the Debtor the funds indicated in the Budget for counsel and/or the carve out for Counsel, which funds counsel shall hold in trust pending interim and/or final approval of fees for such counsel.

25.    With the initial advance under the Budget, the Debtor is authorized and directed to pay City Bank the amount of $2,705,661.10 in full satisfaction of the claim of City Bank, whereupon City Bank shall execute and deliver to the Debtor a release of any and all liens of City Bank in, or, against any property of the Debtor and/or the DIP Collateral.

26.    With the initial advance under the Budget, the Debtor is authorized and directed to pay New Mexico Real Estate Advisors, Inc, ("NMREA") the amount of $168,862.00 in full satisfaction of the claim of NMREA whereupon New Mexico Real Estate Advisors, Inc, shall execute and deliver to the Debtor a release of any and all liens of  NMREA in, or, against any property of the Debtor and/or the DIP Collateral.

### 

Submitted by:
Jeff Carruth (TX SBN: 24001846)
**WEYCER, KAPLAN, PULASKI & ZUBER, P.C.**
3030 Matlock Rd. Suite 201
Arlington, Texas 76105
Telephone: (713) 341-1158
Fax: (866) 666-5322
E-mail: jcarruth@wkpz.com

PROPOSED ATTORNEYS FOR
PDG-PRESTIGE, INC.,
DEBTOR AND DEBTOR IN POSSESSION